Daniel DIAMOND, et al., Plaintiffs,

v.

Floretta McKENZIE, et al., Defendants.

Civ. A. No. 84–0241.

United States District Court,
District of Columbia.

Jan. 22, 1985.

Matthew Bogin, Washington, D.C., for plaintiffs.

---

Kathleen Carey, Asst. Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN GARRETT PENN, District Judge.

The plaintiffs filed this action pursuant to the Education for the Handicapped Act (EHA), 20 U.S.C. § 1400 *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1985(3). Plaintiffs seek to have the Court enter a permanent injunction requiring the District of Columbia Public Schools (DCPS) to place and fund the minor plaintiff Daniel Diamond (Daniel), at the Vanguard School in Lake Wales, Florida. The case is now before the Court on defendants' motion to dismiss [1] and after a trial on the merits.[2]

### I

The underlying facts are as follows: Daniel is a 17 year old severely learning disabled and severely emotionally disturbed child and as such he is a qualified handicapped child as defined by the EHA, 20 U.S.C. § 1401(1). From September 1980 through June 1983, he attended the Lab School of Washington, formerly the Kingsbury Lab School. His placement at that school was funded by DCPS.[3] In August 1983, DCPS referred Daniel to three day placements, the Chelsea School, the Accotink Academy, and the Frost School. Eventually, all three schools refused to accept Daniel.

On August 30, 1983, Dr. Carol G. Johnson, Supervising Director, Assessment and Placement, DCPS, wrote Mrs. Diamond and advised her that intake procedures for Chelsea School could be scheduled for the week of September 6 through September 9. Dr. Johnson went on to state, "[w]e appre-

---

1. The motion was filed just prior to the trial in this case.

2. This Memorandum Opinion constitutes the Court's ruling on the motion to dismiss and the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

3. Daniel has also attended and been funded by DCPS at the Christ Church Child Center at the Saint Maurice School.

ciate the effort you have extended thus far to assist us in locating an appropriate placement for your son, and we solicit your continuing efforts to secure a speedy placement for him for the 1983–84 school year." The following day, August 31, 1983, Ms. Van Buren, Case Manager, Region D, addressed a memorandum through Dr. Johnson to Dr. Robert Burch, Director of the Student Hearing Office, requesting a due process hearing on the grounds that Mrs. Diamond had failed to cooperate with DCPS placement efforts. A hearing was held on November 4, 1983, and the hearing officer filed her determination on November 18. November Determination. The hearing officer denied the complaint and found that, "DCPS has wasted the time and money of both parties by pursuing this course of action with little or no evidence to substantiate its charges." *Id.* at 5. She also noted that a hearing on the appropriateness of the proposed placement, the Wilson Resource Program or in the alternative, Chelsea School, would be held on November 18, 1983. DCPS had proposed those two programs in a Notice of Proposed Change in Educational Placement approved by Dr. Johnson and dated August 31, 1983.

Shortly thereafter, DCPS requested the hearing officer to continue the November 18 hearing on the grounds that "[t]he placement of Aug. 31, 1983 for Chelsea School has been revoked." The hearing officer denied the request on November 15 noting that the proposal for placement at the Wilson Resource Program had not been withdrawn.

A hearing was held on November 18, to determine whether the DCPS proposed placement, the Wilson Resource Program, was an appropriate placement. The hearing officer filed her determination on December 6, 1983. December Determination. The hearing officer observed that DCPS did not present *any* testimony regarding the Wilson Resource Program and that accordingly, DCPS failed to meet its burden of proof. Significantly, the hearing officer concluded that, "it is unclear why DCPS even chose to proceed given the fact that it is still in the process of referring Daniel for placement ... and given the fact that these [referrals] are Level VI Placements [full-time city wide or private schools] and that the Wilson program is a Level II [Resource Room—on site direct service to students in a regular school or career center] placement." *Id.* at 4. The hearing officer then went on to direct DCPS to consider a residential placement. In doing so, she noted that the DCPS Confidential Report, prepared by Dr. McElroy, recommended placement in a "fulltime special education placement in a structured program for learning disabled adolescence with secondary emotional difficulties" and that the Lab School's progress report recommended "mandatory placement in a residential facility". The hearing officer also observed that she had "requested the written submissions on residential placement because so much of the testimony presented on behalf of the parent focused on the need for residential placement and yet DCPS had not addressed that issue." She noted that although she could not recommend a specific placement, the decision "can give DCPS direction with regard to the elements of an appropriate placement, and the consideration of residential placement is such an element." *Id.* at 4. She further observed that DCPS had stated that "one or more of several events must occur in order to refer a case to the Residential Review Committee (Committee), i.e., a signed written request by a parent, a signed written report by a professional, or a signed written report by the DCPS' multidisciplinary team." The hearing officer correctly concluded that those requirements are not contained in the Rules of the District of Columbia Board of Education Board Rules. The hearing officer remanded the case back to DCPS with the direction that on or before January 5, 1984, it was to propose another placement, "consistent with this decision". *Id.* at 5. She further stated that "[i]n the event residential placement is not recommended, DCPS must include with the Notice of Proposed Placement, the report of the Residential Review Committee

indicating, at a minimum, the criteria used to determine eligibility for residential placement". On January 5, 1984, DCPS wrote Mrs. Diamond over the signature of Ms. Van Buren and advised her that "in compliance with the Hearing Officer's Determination of 11–18–83, Daniel's case was presented to the Residential Review Committee 12–20–83. The Residential Review Committee found no justification for residential placement for your son." Also included with that letter was a Notice of Proposed Placement proposing Daniel's placement at the Leary School. Plaintiffs filed this action on January 23, 1984. Plaintiffs had unilaterally placed Daniel in the Vanguard School at Lake Wales, Florida, in September 1983.

## II

■ Prior to addressing the merits, the Court must address the motion to dismiss filed by the defendants.

The defendants contend that this case should be dismissed because the plaintiffs are not "aggrieved" by the findings of the hearing officer or the state education agency, *see* EHA 20 U.S.C. § 1415(e)(2), and because the plaintiffs have failed to exhaust their administrative remedies. These arguments must be rejected.

First, the plaintiffs had requested the hearing officer to recommend a residential placement, but the hearing officer declined to do so, apparently because she felt that such a recommendation was beyond her power. It was obvious, however, that she felt that DCPS should consider a residential placement. In her determination, she observed that, "[a]lthough this decision cannot recommend a specific placement, it can give DCPS direction with regard to the elements of an appropriate placement, and the consideration of residential placement is such an element." December Determination at 4. In making those comments, the hearing officer noted that she "had requested the written submissions on residential placement because so much of the testimony presented on behalf of the parent focused on the need for residential

placement and yet DCPS had not addressed that issue." *Id.* at 4. In remanding the matter back to DCPS, the hearing officer directed the school system to propose a placement on or before January 5, 1984, and, "in the event residential placement is not recommended, DCPS must include with the Notice of Proposed Placement, the report of the Residential Review Committee indicating, at a minimum, the criteria used to determine eligibility for residential placement." *Id.* at 5.

Thus, it is clear that the hearing officer understood the plaintiffs to be seeking a residential placement but that she nevertheless declined to direct such a placement because she concluded that she did not have the power to do so. Clearly then the plaintiffs are aggrieved as that term is used in the EHA and thus they are properly before this Court.

■ Second, the contention that the plaintiffs have failed to exhaust their administrative remedies must also be rejected. Defendants had originally proposed placement in the Wilson Resource Program with an alternative placement at Chelsea School. *See* Notice of Proposed Change in Education Program dated August 31, 1983. After the hearing officer scheduled a hearing on the appropriateness of the above two proposed placements, subsequent to her rejection of defendants' claim that Mrs. Diamond had been uncooperative, DCPS requested a postponement of the hearing on the grounds that the placement of August 31, 1983, for Chelsea had been "revoked". *See* Van Buren Memorandum dated November 13, 1983. In her memorandum, Ms. Van Buren noted that referrals had been made to the Leary School. The hearing officer denied the request noting that DCPS had also proposed the Wilson Resource Program, a matter which would be addressed at the hearing. The hearing, which was to address the DCPS proposed placement at the Wilson Resource Program, went forward on November 18, 1983, but DCPS presented nothing in support of that placement. Indeed, the evidence before the hearing officer reflected that Dan-

iel required a residential placement. When the hearing officer entered the December Determination, she properly required DCPS to consider a residential placement and to set forth the criteria used in considering that issue if DCPS concluded that a residential placement was not necessary. DCPS rejected the request for residential placement but did not set forth the criteria used to consider the placement or the grounds upon which the placement was denied. All DCPS did was to state that the request had been submitted to the Residential Review Committee which had found "no justification for residential placement for [Daniel]." Van Buren letter dated January 5, 1984. The letter is woefully short of the requirements of the Hearing Officer. It was after that action that the plaintiffs instituted this action.

The above facts justify plaintiffs' conclusion that further resort to the administrative process would be futile.

Moreover, on August 30, 1983, DCPS had commended Mrs. Diamond for her efforts to assist the school system in locating an appropriate placement, and on August 31, 1983, DCPS had initiated a due process hearing which was to address Mrs. Diamond's alleged failure to cooperate. The hearing officer had characterized the DCPS complaint as a waste of time noting that most of the problems encountered resulted from the failure of DCPS to communicate with the Diamonds. DCPS then thereafter attempted to postpone a second due process hearing, and when the request was denied, DCPS presented nothing in support of its proposed placement. Finally, DCPS failed to comply with the direction of the hearing officer's December Determination.

The claim that plaintiffs failed to exhaust their administrative remedy must be denied since the above is ample evidence that further administrative proceedings were futile.

### III

■ The denial of the defendant's motion to dismiss does not put to rest the question whether some of the claims asserted by the plaintiffs should be dismissed. It is clear that the primary reason the plaintiffs brought this action is to enforce rights guaranteed by the EHA, however, they have also asserted claims under the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Civil Rights act of 1871, 42 U.S.C. §§ 1983 and 1985(3), and the Fifth Amendment to the Constitution of the United States. In their claims for relief, they asked the Court to certify this as a class action and to enjoin defendants from operating the Residential Review Committee. They also named several of the defendants in their individual and official capacities, and they request both compensatory and punitive damages. Finally, they ask the Court to award attorney's fees pursuant to 42 U.S.C. § 1988 and 29 U.S.C. § 794a.

This action was filed in January 1984. Subsequent to the filing of the complaint, and indeed, subsequent to the filing of the motion to dismiss and the trial in this case, the Supreme Court addressed the issue whether plaintiffs in cases brought under the EHA can also assert claims under the above statutes. *Smith v. Robinson,* —— U.S. ——, 104 S.Ct. 3457, 82 S.Ct. 746 (1984). The Supreme Court concluded that Congress intended the EHA "to be the exclusive avenue through which a plaintiff may assert an equal protection claim to publicly financed special education." *Id.,* 103 S.Ct. at 3468. The Supreme Court noted that "where the EHA is available to a handicapped child asserting a right to a free appropriate public education, based either on the EHA or the Equal Protection Clause of the Fourteenth Amendment, the EHA is the exclusive avenue through which the child and his parents or guardian can pursue their claim." *Id.* at 3470. Finally, the Supreme Court observed that "[w]here § 504 [29 U.S.C. § 794] adds nothing to the substantive rights of a handicapped child, we cannot believe that Congress intended to have the careful balance struck in the EHA upset by reliance on § 504 for otherwise unavailable damages or for an award of attorney's fees." *Id.* at 3474. The Supreme Court noted, however,

that the decision in *Smith* is limited and does not address the case where the EHA is not available or where the Rehabilitation Act guarantees substantive rights not available under the EHA. *Id.* at 3474.

The trial of this case was bifurcated; the trial already held addressed the EHA claims, while a future trial was to address the remaining claims. While the Court did not specifically address the claims asserted under the statutes other than the EHA, it nevertheless may review the entire record to determine whether the claims asserted in the non-EHA counts are truly separate and distinct claims from those asserted under the EHA. After reviewing the record and the claims asserted in the non-EHA counts, the Court concludes that the other statutes and the Fifth Amendment really add nothing to plaintiff's substantive rights under the EHA.

Plaintiffs allege that the defendants have denied them due process, but these claims are virtually identical to the claims asserted under the EHA. *See* 104 S.Ct. at 3468. They complain that the Residential Review Committee deprives them of rights guaranteed by the Fifth Amendment and the EHA. Again, these are matters properly addressed in an action under the EHA. Plaintiffs contend that the actions of the defendants, for example, in complimenting Mrs. Diamond on one day and charging her with bad faith the following day, should permit plaintiffs to maintain this action under the non-EHA statutes, but, again, all of these matters can be addressed by the hearing officer in an administrative hearing under the EHA, or by this Court under the same statute. The Court concludes therefore that these plaintiffs may not assert claims under any statute other than the EHA. Those claims asserted under the Fifth Amendment, the Civil Rights Act of 1871, and the Rehabilitation Act of 1973, will be dismissed, *sua sponte,* based upon the authority of *Smith v. Robinson, Tschanneral v. District of Columbia Board of Education,* 594 F.Supp. 407, 409 (D.D.C.1984). This means that plaintiffs may not recover damages against defendants, and it means that plaintiffs may not recover attorney's fees under the above statutes. It does not mean, however, that the plaintiffs may not seek attorney's fees where they can establish that the defendants are guilty of bad faith or vexatious conduct.

The Court will dismiss the District of Columbia Board of Education as a party in this action since the Board is not a suable entity. *Tschanneral, supra,* at 409.

## IV

■ At the hearing on the merits, the plaintiffs argued that Daniel requires a residential placement and they presented evidence to establish that Vanguard School is an appropriate placement. The defendants contend that Daniel does not require a residential placement and they presented evidence seeking to establish that the Leary School is an appropriate placement. After considering all of the evidence, the Court finds as a fact and concludes as a matter of law that Daniel requires a residential placement and that the Vanguard School represents an appropriate placement.

The record in this case consists of the testimony and documents presented at the hearing before this Court. The record also includes the record of the administrative proceedings. 20 U.S.C. § 1415(e)(2). The decision of the Court must be based on a preponderance of the evidence. *Id.* In this connection, it is noted that the plaintiffs offered evidence during the administrative hearing held on November 18, 1983, which would support a residential placement. At that time, the hearing officer was asked to determine whether the DCPS proposed placement at the Wilson Resource Center was appropriate, but DCPS presented no evidence in support of that placement. Thus, all of the evidence before the hearing officer focused on a residential placement.

The Court finds the evidence offered by the plaintiffs to be persuasive. Dr. Suter, who testified at the administrative hearing and before this Court, has known Daniel for over six years. Dr. Suter is an Adult

and Child Psychologist. She testified that in her opinion Daniel requires a residential placement. She further testified that in her opinion Vanguard is "highly appropriate". She also observed that Daniel has been at Vanguard since September 1983 and has made considerable progress. On the other hand, it was her opinion that Leary is not appropriate because Daniel requires a 24 hour structured program. While DCPS has proposed the Leary program and family therapy, Dr. Suter gave her opinion that family therapy is inappropriate at this time.

Daniel's mother testified at the administrative hearing and at the trial before this Court. She stated that originally Vanguard was not sure that Daniel would work out in the school but had agreed to give him a trial. She sees a "big change" since his placement at Vanguard and it is her opinion that his placement there is appropriate and beneficial. Mrs. Diamond conceded that she had no real interest in having Daniel placed at Leary.

Two other witnesses who testified stated that, in their opinion, Daniel required a residential placement. Of these two, the most persuasive was Helen Levine who worked at the Lab School and had personal knowledge of Daniel. She is quite familiar with his case and has had an opportunity to observe him at the Lab School.

The defendants called the director of the Leary School to testify in support of their contention that Leary represents an appropriate placement. Mr. Mead, the Director, had not seen Daniel and therefore any opinion he would have given would be based on the various reports prepared by the schools. Mr. Mead really did not give an opinion on the question of an appropriate placement for Daniel.

The defendants also called Dr. Silverman, a Clinical Psychologist, as a witness. He served as a member of the Residential Review Committee and his opinion is limited to what he read rather than a personal observation of Daniel. Moreover, cross-examination established that Dr. Silverman may not have had access to all records relating to Daniel. For example, he did not review Dr. Suter's report at the time he sat on the Committee. Dr. Silverman's testimony supported plaintiff's claim that the members of the Residential Review Committee are asked to make a determination based upon less than adequate records.

Two other witnesses called by the plaintiffs ventured no opinion, although one, Dr. Young, had visited Vanguard School and had seen another child placed at that school by DCPS. The other person, Ms. Van Buren, was not asked for an opinion. She is familiar with Daniel and had also visited Vanguard. Ms. Van Buren presented the case before the Residential Review Committee.

It is clear that the witnesses called by the plaintiff have a greater familiarity with Daniel than those called by the defendants. Moreover, two of the witnesses have had a full opportunity to observe Daniel over a period of years. In addition, Daniel has been at Vanguard and is making progress, a factor which cannot be overlooked. As noted, plaintiffs have established by a preponderance of the evidence that Daniel requires a residential placement and that the Vanguard School represents an appropriate placement. The Court concludes that DCPS should place and fund Daniel at the Vanguard School. The Court further concludes that the Leary School does not represent an appropriate placement.

## V

Two additional issues must be addressed.

■ First, the defendants have taken the position that the Residential Review Committee has official status and that parents seeking to have their children considered for residential placement must satisfy the criteria allegedly established by the Committee. Defendants are wrong on both counts. The Residential Review Committee has no official status or standing under the EHA, the regulations promulgated thereunder, or indeed, the Board rules. Where the record before the hearing officer demonstrates that a residential place-

ment is required, the hearing officer may direct DCPS to propose an appropriate residential program and that determination is not subject to review or veto by the Residential Review Committee. While DCPS and the defendants may utilize such a committee as an internal committee to review requests for residential placements, parents may not be required to present cases before the committee or to petition the committee as though the committee represents an additional level of review under the EHA. Hearing officers need only look to DCPS and the defendants when entering determinations and requiring appropriate action. To hold otherwise would be to subject children and their parents to an additional step not required by the EHA.

Moreover, this Court can see no valid reason why a hearing officer cannot consider a placement proposed by the parents as well as one proposed by DCPS. This case is a perfect example of the delays which may be caused by limiting the consideration which hearing officers can give to parent proposals. DCPS purported to recommend the Wilson Resource Program for Daniel. The hearing officer scheduled a hearing to consider that proposal. The plaintiffs argued that Daniel requires a residential placement. In such a case, it is logical and reasonable for the hearing officer to hear evidence concerning the DCPS proposed placement and evidence concerning the plaintiffs' proposed placement. This tends to focus the issues which the hearing officer must address. Plaintiffs should not be limited to the presentation of a negative argument; rather, they may present evidence in support of alternative programs they contend the child requires. Thus, if the hearing officer determines that the DCPS proposed placement is inappropriate, she may then consider the parents' proposed placement and direct such a placement or program if satisfied that it is appropriate. Such a procedure would have the effect of shortening the overall administrative process and saving time and expense for DCPS, the parents, and the hearing officer.

This does not mean that the hearing officer must rule in favor of DCPS or the parents. Indeed, in a given case, the hearing officer may determine that neither side has made out a case and may conclude that the matter must be remanded for additional studies or the submission of additional evidence. Here, when DCPS presented no evidence in favor of its proposed placement, and the plaintiffs presented evidence favoring a residential placement, the hearing officer could have directed a residential placement without referring the matter back to DCPS if she determined that such action was warranted and if the evidence established that Daniel required a residential placement. Furthermore, the hearing officer was not limited to making a determination that Daniel requires a residential placement. If appropriate, she could have determined that a specific placement is appropriate. For example, the hearing officer could have determined that a residential placement is required and that the Vanguard School is an appropriate placement. Depending upon the facts developed at the hearing, the hearing officer could then direct the placement supported by the evidence, or afford DCPS a reasonable opportunity to propose an alternative residential placement.

■ Second, is the issue of attorneys' fees. While the Supreme Court has ruled that the EHA does not provide for attorneys fees and that parents may not seek such fees under the Rehabilitation Act of 1973 or the civil rights statutes, this Court does not read *Smith v. Robinson,* as holding that a Court, in the appropriate case, may never award attorney's fees. Rather, all the Supreme Court has done is to establish that there is no statutory basis to award fees in an EHA case. A court is still free to award fees under the exception to the "American Rule" if it determines that a party has acted in bad faith. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). As the Supreme Court has

observed, "[w]e have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich,* 417 U.S. at 129, 94 S.Ct. at 2165. This is such a case.

DCPS commended Daniel's mother for her cooperation and assistance in seeking to place him one day, and the following day initiated a due process hearing on her failure to cooperate. The hearing officer concluded that "DCPS has wasted the time and money of both parties by pursuing this course of action with little or no evidence to substantiate its charges."[4] November Determination at 5. Then DCPS allowed the second due process hearing to go forward even though it was not prepared to present evidence in support of its recommended placement. That action lead to the filing of this law suit based on plaintiff's determination that further resort to the administrative process would be futile. Plaintiff should not now be required to bear the expenses of this litigation. The Court finds as a fact and concludes as a matter of law that DCPS and the defendants acted in bad faith in pursuing the administrative actions leading up to the filing of this action; accordingly, this case represents an exception to the American Rule and as such defendants shall be responsible for plaintiffs' attorney's fees and costs.

An appropriate order consistent with this Memorandum Opinion has issued.

---

**4.** Apparently, the hearing officer concluded that at least a part of the problem was caused by the failure of DCPS to communicate with the plaintiffs.